**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **UNITED STATES OF AMERICA, ex rel NONA WATSON,** | **FILED UNDER SEAL AS REQUIRED BY 31 U.S.C. § 3730** |
| Plaintiff, | |
| v. | **CIVIL ACTION NO.** |
| **CITY OF BUFFALO,** | |
| Defendant. | **JURY TRIAL DEMANDED** |

## COMPLAINT

Plaintiff-Relator, Nona Watson ("Plaintiff-Relator") through her attorneys, brings this false claims complaint against Defendant, City of Buffalo ("Defendant" or the "City").

## NATURE OF THE CASE

1. Plaintiff-Relator's case arises from Defendant's violation of the False Claims Act, 31 U.S.C. §3729 et seq.

2. Qui Tam Relator, Nona Watson brings this action on her own behalf and on behalf of the United States of American to recover damages and penalties under the False Claims Act against Defendant.

3. Defendant made false submissions and perpetrated a well-orchestrated fraud upon the Buffalo Urban Renewal Agency ("BURA" or "Agency") and the U.S. Department of Housing and Urban Development ("HUD") that led to improper use of entitlement funds being paid by the United States Government for other than the specified purposes.

4. Defendant constructively terminated Plaintiff-Relator without proper authority, approval, or knowledge of the BURA Board of Directors, in retaliation for raising concerns about

Defendant's fraud upon BURA regarding the improper use of entitlement funds.

## JURISDICTION AND VENUE

5. This Court maintains jurisdiction under 28 U.S.C. §§ 1331, 1345 and 31 U.S.C. § 3732.

6. Venue is proper in the Western District of New York under 28 U.S.C. §§ 1391(b) and (c) and 31 U.S.C. § 3732 because the Defendant conducts business in this district and committed fraudulent acts in this district.

7. This action is filed *in camera* and under seal pursuant to the requirements of 31 U.S.C §§ 3729 and 3730(b), and is to remain under seal for a period of at least sixty (60) days and shall not be served on the Defendant until the Court so orders.  The Government may elect to intervene and proceed with the action within sixty (60) days after it receives both the Complaint and the material evidence and information.

## PARTIES

8. Defendant City of Buffalo is headquartered at 712 City Hall, Buffalo, NY.

9. Plaintiff-Relator Nona Watson is a citizen and resident of the State of New York.

10. As required under the Act, the Relator has furnished to the Attorney General of the United States and to the United States Attorney for the Western District of New York simultaneous with or prior to the filing of this Complaint, a statement contained herein of all material evidence and information related to the Complaint.  This disclosure statement is set forth in the Complaint, and supports the existence of overcharges and false claims by the Defendant.

## BACKGROUND

11. At all times relevant to this action, Defendants perpetuated a fraud against the United States by devising and implementing a scheme in violation of the False Claims Act, 31

U.S.C. §§ 3729 et seq.

12. Plaintiff-Relator personally observed the improper practices described below and has seen, in the ordinary course of her employment, the misuse of federal funds.

13. Relator is an original source individual, with direct and independent knowledge of the information set forth herein, and she has voluntarily provided the information to the government pursuant to 31 U.S.C. §3730(4)(B).

14. Plaintiff-Relator began working for BURA in September of 2015.

15. Plaintiff-Relator held the position of Executive Director.  This position is the chief executive officer for BURA, which is governed by a nine-member Board of Directors.

16. BURA was established in 1966 and is a public corporation formed by the State of New York and the City of Buffalo.  BURA has been a partner with the City of Buffalo for over 50 years and its purpose includes the general planning and operation of various urban renewal programs designed to prevent or eliminated blight and deterioration in the City of Buffalo.  BURA promotes efficient planning, financing and completion of neighborhood-driven development projects and enhances and maintains the quality and urban living in the City of Buffalo.

17. BURA also serves as a pass through agency for the Section 8 Housing Choice Voucher ("HCV") program, administered by the Buffalo Municipal Housing Authority ("BMHA") and Rental Assistance Corporation ("RAC").

18. The City's staff manipulated and controlled the Agency in order to abuse and misuse federal funds.

19. The City of Buffalo receives federal entitlement funds provided by Housing and Urban Development ("HUD").  HUD provides yearly allocation of funds through the

3

Community Development Block Grant ("CDBG") and HOME Investment Partnerships (HOME) programs to the city, of which BURA serves as administrator.

20. From 2006 through 2018, the City of Buffalo received an annual allocation of HUD HOME entitlement funds.  The yearly average allocation is approximately $3,629,723.00.

21. Upon information and belief, Plaintiff's position was created after concerns were raised by HUD regarding separation of duties and responsibilities between BURA and the Defendant, and as it related to HUD entitlement funds and programs.

22. There was a conflict of interest due to the many roles held by Brendan Mehaffy, Executive Director for the City's Office of Strategic Planning ("OSP").  Mr. Mehaffy also serves as the Vice Chairman on BURA's Board of Directors.  In his role as Executive Director for the City's OSP, he represents the City regarding agreements between the City and BURA.  These multiple roles allowed him to select, develop, and approve projects for both the City and BURA with no checks or balances.

23. At the same time Plaintiff was hired, Mr. Mehaffy was removed from his role as Vice Chairman.  Despite removing this title from Mr. Mehaffy, the City permitted Mr. Mehaffy to continue to operate as he did in the past.  Thus, the title change proved to be purely superficial.

## DEFENDANT'S ACTS

24.  Federal funds are designated and allocated by HUD to support eligible programs and administrative costs, however, Defendant frequently used BURA employees and funds to accomplish city business.  Furthermore, all requests by BURA for reimbursement of said funds were denied.

25. For example, Scott Billman, BURA's General Counsel, provides legal assistance to the City and performs work that should be done by the City's Office of the Corporation Counsel. Mr. Billman provides constant legal advice and prepared documents for Mr. Mehaffy concerning city real estate transactions. Mr. Billman's billable hours were never reimbursed by the City to BURA.

26. Mr. Billman's assistant, Rise Geller-Alongi, also performed research and drafted documents for the City but was not reimbursed. This work is reflected on his time records.

27. Leslie Vishwaneth, BURA's Housing Specialist, researched, wrote and managed City grants. She meets with financial institutions on behalf of the City, yet she charges all of her time to federal programs.

28. City employee, Dana Glantz, works in the City's IT Department and upon information and belief, is paid fully from the Community Development Block Grant ("CDBG") dollars intended for BURA. Yet, all of her work is for the City, not BURA.

29. The City pays various other employees with HUD entitlement funds; however, no time and attendance records were kept as required by HUD regulations.

30. BURA serves as a pass-through for the HUD Section 8 program and charges an administrative fee to Rental Assistance Corporation ("RAC") and the BMHA totaling over $300,000 annually (with no work performed; however, Plaintiff-Relator pressed for BURA to qualify and quantify an administrative fee, with minimal success). Due to a decrease in funding for the Section 8 Housing Choice Voucher, the RAC director requested for some of the administration fee to be used to help keep the program afloat and to enhance self-sufficiency initiatives for the tenants. This request was denied by

Donna Estrich, Commissioner of the City's Office of Administration, Finance, Policy, and Urban Affairs.

31. Commissioner Estrich denied this request and chose to use the funds as a cushion for other emergencies that she said might arise in the City or BURA.

32. Although the monies are federal dollars, they show up on BURA's accounting as unrestricted funds. Unrestricted funds are funds that do not have to return to a federal program and can be expended any way desired.

33. Instead, however, these funds are often used to settle City debt; some of which is owed to HUD.

34. Furthermore, HUD funds are often used to repay HUD for other City program deficiencies. This information is hidden in financial records and the Agency's single audit does not disclose these transactions.

35. The City also received an annual allocation of entitlement funds from HUD HOME. The yearly average total of these funds allocated to the City is $3,629,723.00.

36. Many real estate developers compete for HOME and Community Development Block Grant ("CDBG") funds to construct, rehabilitate or convert existing structures into affordable housing and/and/or mixed-income/mixed-use projects. The City orchestrated a "steering" scheme to position developers to receive City-owned land, federal funding, and privileged inside information. Although BURA completed the RFP process and all appears to be valid on paper, the selection process for these projects was anything but competitive.

37. The yearly allocation could fund approximately 4-5 projects, depending on how funds are distributed. If used correctly, the funds could assist in developing a diverse pool of real estate developers from all backgrounds, from year to year.

38. Applicants are misled into believing this is a fair and equitable process, but instead, all decisions are made by Mayor Brown and Mr. Mehaffy, and are based upon their own personal agendas.

39. Plaintiff-Relator has witnessed this during every request for proposal (RFP) process, especially the awarding of HOME funds to Creative Structures Services, where David Pawlik, former Deputy Commissioner of Housing and Community Development for the City, serves as founder and co-owner. Upon information and belief, Mr. Pawlik is a close friend of Mayor Brown.

40. Based on Plaintiff's calculations, from 2006 to present, 20% of HOME funds have been awarded to projects that Mr. Pawlik was a part of. RP Oak Hill Building Company Inc. receives the second highest percentage at 17% and Lamperelli Construction Co. receives the third highest at 14%.

41. Some examples of these projects in which Plaintiff-Relator witnessed favourable treatment and conflicts of interest are:

(a) Northland Corridor – a project to redevelop multiple properties in the Northland Avenue /East Delevan Avenue corridor. The developer was Buffalo Urban Development Corporation (BUDC). Mayor Brown and Mr. Mehaffy, both members of BUDC's board, awarded $4,000,000 in CDBG funds. Work began on this project even before an application

was submitted and a HUD environmental review took place. HUD

halted forward movement until this was done correctly.

(b) 2201-2209 Fillmore – a project to convert two vacant buildings on

Fillmore Avenue into apartments and commercial space. The developer

was Onyx Global, and the General Contractor was Creative Construction

Services ("CSS"). Brenda Calhoun was brought into the project by

Mayor Brown and Mr. Pawlik. Ms. Calhoun was set up, mentored and

partnered with Mr. Pawlik. Mr. Mehaffy then issued a "special call" for

this proposal. Since BURA only issued RFPs once or twice a year,

"special calls" were issued when Mr. Mehaffy wanted to provide more

opportunities for his preferred groups, even if they were working on

current projects. This project and often others supported by Mayor

Brown and Mr. Mehaffy often got moved to the front of the line even

though there were other eligible projects approved and ready to go. Mr.

Mehaffy informed Plaintiff-Relator that Mayor Brown insisted that this

project must be selected.

(c) Mount Aaron Village – a project to redevelop 19 vacant parcels on the

City's East Side. The developer was Community Hope Builder; General

Contractor: RP Oak Hill. This is a new developer who finished its first

project in 2006 in which it received $1,453,950 in HOME funds for a

10-unit senior apartment building. The following year, it was ready to

construct a 59-unit building. Most recently, it was awarded $850,000 in

HOME funds for that project, and the project was moved to the top of the selection process without regard to the current pool of applicants.

(d) Linwood/Lafayette – a project to develop new senior apartment buildings. The developer was TM Montante/People Inc. Mr. Mehaffy informed Plaintiff-Relator that this project had to more forward. Plaintiff-Relator attended meetings in which Mr. Mehaffy made a deal with TM Montante regarding the HOME allocation, city real estate, and the establishing of the project area as an Urban Development Action Area (UDAA). These meetings also established this area to be an Urban Development Action Area by BURA. Because this area did not qualify for an exemption, Plaintiff-Relator objected to the project. A court confirmed that the area did not qualify.

(e) Jefferson Avenue Apartments – a project to develop apartment buildings on the City's East Side. The developers were Mr. Pawlik, Nick Sinatra, Herb Bellamy and People Inc. This project involved land swapping, land banking and led to double dipping with assistance of Mayor Brown, Mr. Mehaffy and Mr. Pawlik. The amount of money invested in this land was less than $100,000, however, before the project began, Mr. Sinatra and Mr.Pawlik sold their parts of the land for $473,684.16 and then sold the land they acquired from the city for $197,368.48. Upon information and belief, the state paid for this land as part of the project.

1. The property located at 1162 Jefferson was purchased by 6350 Group LLC, Mr. Sinatra's affiliate, for $45,000 and sold to Jefferson Ave. Housing Development for $78,947.

2. Properties transferred from 1200 Jefferson Properties, Mr. Sinatra affiliate, for $1.00 were sold to Jefferson Ave. Development Fund, which was the development team for the project, for $473,684.16. This development team included Mr. Sinatra.

3. Bono Clark, 1200 Jefferson Properties, City of Buffalo, 6350 Group LLC, Jeff-North Group and Jefferson Avenue Housing Development were all involved in the transferring and selling of those properties.

4. All of those entities, except the City of Buffalo, are affiliated with Mr. Pawlik and Mr. Sinatra.

5. After Plaintiff-Relator's termination, the City had BURA execute a HOME agreement for this project to receive federal funding on October 25, 2018.  This project is receiving $500,000 in federal HOME funds.

(f) 240 Kensington – a project to construct senior apartments.  The developers were Mr. Pawlik and Nick Sinatra. This property is still owned by the City, but this entity has designated developer status.  Mr. Mehaffy has approved this project multiple time, but it has not yet been chosen by the state.  Mr. Mehaffy continues to hold a place for this project even though it has not met all the state's requirements. Once the

state approves this project, Plaintiff-Relator contends it will automatically be pushed through, knocking out other projects that were scheduled to move forward.

42. Because of his relationship with Mayor Brown and Mr. Mehaffy, Mr. Pawlik is privy to many benefits given to him by the City, including, real estate deals, support for Brownfield Opportunity Areas (state-sanctioned urban cleanup projects) and historic credits, tax credits, tax exemptions, access to grant funds without true competition, other financial opportunities for affordable and market rate housing, relationships/partnerships, and inside information regarding future deals.

43. Mr. Mehaffy's roles and responsibilities cross over into many agencies, departments and boards.  He applies, approves, votes and executes with no checks and balances in place.

44. Commissioner Estrich has been struggling to make the budget work from year to year. Commissioner Estrich told Plaintiff that the City would not be in the situation it is in if the "Mayor did not give so many tax breaks to these developers."

45. Mayor Brown has made decisions and approved previous projects without proper documentation and/ or going through proper protocol.  For another example, one such decision provided $2,750,000 to the church he attends.  This type of behaviour, misuse, and abuse of federal funds is also cause for delay regarding more recent projects.

<u>Retaliation</u>

46. Plaintiff-Relator made many complaints regarding the misuse of federal funds and the use of BURA staff to the Mayor, Deputy Mayor Elizabeth Ball, Mr. Mehaffy, and Commissioner Estrich.

11

47. Plaintiff-Relator was harassed and threatened because she verbalized her concerns and would not turn a blind eye and would not sign off on things that were improper, including the misuse and abuse of BURA in general, as well as HUD entitlement funds.

48. During the week of September 17, 2018, after Mayor Byron Brown signed an offer letter for a candidate for a BURA accountant position, an offer was made via mail and telephone by BURA's Deputy Director of Fiscal Control of Agencies, Tracey Cooley.

49. On September 26, 2018, Mr. Mehaffy, upset because the decision to hire this candidate was made without him, spoke to the Mayor and informed him of alleged budgeting issues and recommended that the position not be filled.

50. The Mayor Brown then asked BURA to rescind the offer letter.  Plaintiff-Relator did not support this decision.

51. Mr. Mehaffy and Commissioner Estrich wanted to apply the available monies to two already existing City positions in an effort to assist with the City's budget.

52. Plaintiff voiced her concerns about this because she knew it was an ineligible activity and would eventually become a violation and/or finding with HUD.

53. The following day, Plaintiff-Relator was called in to a meeting in which she was harassed and threatened by Mr. Mehaffy and Ms. Estrich.   Plaintiff-Relator was told that because of her open statements about them and what was happening, they would be making a decision about her future with BURA.

54. The next week, on October 5, 2018, Plaintiff-Relator was brought into a meeting with Deputy Mayor Ball and Mr. Mehaffy.  During this meeting, Plaintiff-Relator was told by Mr. Mehaffy and reiterated by Deputy Mayor Ball that they wanted to go in a different direction with the executive director position and that Plaintiff-Relator could resign or be

terminated.  As a public benefit corporation, such an action should have been executed by the Board of Directors, not the Vice Chairman of the Board and the Deputy Mayor.

55. During this meeting, Plaintiff-Relator was also told that she was exercising more authority than they had originally intended.  Deputy Ball made referenced to Plaintiff's use of the word "corruption" and Plaintiff-Relator attempted to further share with Deputy Ball her observations, to no avail.

56. Plaintiff-Relator attempted to report to work on the next business day, October 9, 2018 but she was locked out of City hall and all access to computers, etc. was deactivated. Plaintiff-Relator had no choice but to turn over her key fob, keys and identification.

57. Plaintiff emailed her resignation that same day.

58. Plaintiff was constructively terminated because she raised concerns about illegal and inappropriate practices, including the misuse of federal funds.

59. Defendant constructively terminated Plaintiff-Relator without proper authority, approval, or knowledge of the Board of Directors.

## COUNT I

## FALSE CLAIMS ACT VIOLATION - 31 U.S.C. § 3729(a)(1) & (2)

60. Paragraphs 1 through 57 above are incorporated herein by reference.

61. Defendant knowingly misused federal money to conduct City business.

62. Defendant made and used false and fraudulent statements or caused false and fraudulent statements to be made or used for the purpose of aiding in the obtaining of improper federal funds.  These claims were fraudulent for the various reasons set forth in this Complaint.

63. A statutory civil penalty of five thousand dollars ($5,000.00) to ten thousand dollars

($10,000.00) for each false claim submitted, and the treble damages applied to the amount of the overpayments from the federal government, should be levied against Defendant.

64. The government of the United States has made and will make payment upon false and fraudulent claims and thereby suffer damages.  The United States is entitled to full recovery of the amount paid by the federal grands pursuant to the submission of false claim which Defendant caused to be submitted.

65. Plaintiff-Relator believes and avers that she is an original source of the facts and information on which this action is based.

## COUNT II

## RETALIATION IN VIOLATION OF THE FALSE CLAIMS ACT - 31 U.S.C. § 3729(a)(1) & (2) and 31 U.S.C. § 3730(h)

66. Paragraphs 1 through 57 above are incorporated herein by reference.

67. Defendants subjected Plaintiff-Relator to retaliation for having engaged in protected action, in violation of 31 U.S.C. § 3730.

68. As a direct result of Defendants' acts set forth herein against Plaintiff-Relator, Plaintiff-Relator has lost past and future wages and other employment benefits, and has suffered damage to her reputation and severe and lasting embarrassment, humiliation and anguish, and other incidental and consequential damages and expenses.

69. Defendants' conduct was outrageous, was done in a deliberate and malicious manner intended to injure Plaintiff-Relator and was done in conscious disregard to Plaintiff-Relator's rights. Therefore, Plaintiff-Relator is entitled to an award of punitive damages.

70. **WHEREFORE,** Plaintiff-Relator, on behalf of herself and the United States

government, requests the following relief:

(a) Judgment against the Defendant in the amount of three (3) times the amount of damages the United States of America has sustained.

(b) A civil penalty of not less than $5,000.00 and not more than $10,000.00 for each action in violation of 31 U.S.C. 3729 and the appropriate fines and penalties for violating the protective federal laws applicable to the fraudulent and false conduct and the cost of this action with interest.

(c) That the Plaintiff-Relator be awarded all costs incurred, including reasonable attorney's fees.

(d) In the event that the United States proceeds with this action, Plaintiff-Relator be awarded the maximum amount allowed for Qui Tam Relators under 31 U.S.C.§ 3730 (d) and/or other applicable provision of law.

(e) Defendant be enjoined and restrained from harassing or discriminating against Plaintiff-Relator.

(f) Such other relief as this Court deems just and appropriate.

DATED: Cheektowaga, New York
        November 18, 2019

Respectfully submitted,

Harvey P. Sanders, Esq.
Sanders & Sanders
401 Maryvale Drive
Cheektowaga, NY 14225
(716) 839-1489